UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

MONSANTO COMPANY                                              PLAINTIFF

V.                                  CIVIL ACTION NUMBER: 3:00CV-161-P-D

MITCHELL SCRUGGS; EDDIE SCRUGGS;
SCRUGGS FARM & SUPPLIES, LLC;
SCRUGGS FARM JOINT VENTURE;
HES FARMS, INC.; MES FARMS, INC.;
AND MHS FARMS, INC.                                          DEFENDANTS

## SCRUGGS DEFENDANTS' MEMORANDUM BRIEF IN SUPPORT OF MOTION TO RECONSIDER ORDER DENYING SUMMARY JUDGMENT

### I. Introduction and Review

On March 3, 2009, this Court accepted that there is a "wealth of persuasive authority"[1]

contrary to its Order [731] denying summary judgment for the Scruggs Defendants on patent

---

[1] While the Court's opinion did not identify particular authorities, these at least include, *inter alia,* Baluch, "Seed Exhaustion: Quanta's Effect On Biotech Patents,"IP Law 360 (July 7, 2008), available at http://www.foley.com/files/tbl_s31Publications/FileUpload137/5155/AndyBaluchIPLaw360.pdf; Noonan, "Quanta Computer, Inc. v. LG Electronics, Inc. (2008)," available at http://patentdocs.typepad.com/patent_docs/2008/06/quanta-computer.html; PLI Briefing "Life After Quanta: What Every Patent Lawyer Needs to Know." available at http://www.pli.edu/product/mp3_detail.asp?id=50134; Wegner, *Post-Quanta, Post-Sale Patentee Controls,* 7 J. MARSHALL REV. INTELL. PROP. L. 682, 684, 694-98 (2008); Leaven, *The Misinterpretation Of The Patent Exhaustion Doctrine And The Transgenic Seed Industry In Light Of Quanta v. LG Electronics,* 10 N.C.J. L. & TECH.119 (2008); Holmes, *Strategies for the New Patent Law Frontier,* Practicing Law Institute Order No. 18979 at * 445 (March 2009); Schlicher, *The New Patent Exhaustion Doctrine of* Quanta v. LG: *What It Means for Patent Owners, Licensees, and Product Customers,* 90 J. PAT. & TRADEMARK OFF. SOC'Y 758 (2008); Beard, *The Limits of Licensing: Quanta v. LGE and the New Doctrine of Simultaneous Exhaustion,* 2008 UCLA J.L. & TECH. 3 (2008); Kieff, Quanta v. LG Electronics: *Frustrating Patent Deals By Taking Contracting Options Off the Table?*, 2008 Cato Sup.Ct. Rev. 315, 320 (2007-2008).

exhaustion grounds. Since March 3 even more such contrary authority has emerged, more persuasive and from more authoritative sources.[2]

*Quanta Computer, Inc. v. LG Electronics, Ind.*, 553 U.S. __, 128 S. Ct. 2109 (2008) teaches that, at best, post-sale limits on downstream use of a patented article are a matter of contract only; such contractual restrictions *vel non* have **no bearing** on whether a sale **exhausts the patent**.[3] These teachings apply to **all patents**. They apply as much to replicating seed components as to inanimate computer components.[4]

*Quanta* also teaches that, **as a matter of patent exhaustion law**, the "established fact that Scruggs did not have a license" avails nothing. By definition, no buyer of a patented product mounting a successful exhaustion defense has a license. There is no need to go to the trouble of pleading and proving exhaustion if you have a license.

Independent of the new and old "persuasive authority," the Order [731] is demonstrably wrong on each of two outcome determinative premises:

---

[2] *See, e.g.,Transcore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009); *LG Electronics, Inc. v. Hitachi, Ltd.*, 2009 WL 667232 (N.D. Calif. March 13, 2009); *Static Control Components, Inc. v. Lexmark International, Inc.*, 2009 WL 891811 (E.D. Ky., March 31, 2009), all to be discussed *infra*.

[3] At pages 11 - 12 of our Amended Memorandum Brief in Support of Motion to Reconsider Denial of Summary Judgment [678] and page 8 of our Rebuttal Brief [691] we explained that an "authorized sale," not an "unrestricted sale" is required.

[4] In *Quanta*, the Supreme Court relied on *Univis Lens* to find patent exhaustion. That the Court was addressing patented computer technologies, not a patented process for making eyeglass lenses, was irrelevant to its analysis.

- This Court was factually wrong when it misread "the license agreements between Monsanto and its seed partners . . . only [to] permit the sale of seed containing Monsanto's patented biotechnology to <u>licensed</u> growers." Order [731], at 2.[5]

- This Court was legally wrong when it credited the Federal Circuit's *Scruggs I*[6] misreading of exhaustion doctrine which founders on a combined consideration of (1) biological inevitability as certain as that the Sun will rise in the East, (2) the common law of personal property rights in progeny of living organisms, (3) settled federal law that exhaustion frees the buyer "to the use of that 'item' so long as it [is] capable of use." *Quanta*, 128 S.Ct. at 2115, citing *Adams v. Burke*, 84 U.S. 453, 455 (1873), and (4) the natural reality that second and subsequent generation seeds inhere in the product the farmer may use as he pleases free of the patent monopoly.[7]

There is no legal need for a sale of what farmer Scruggs already owned outright, the Federal Circuit's pre-*Quanta* protestations to the contrary notwithstanding. The *Scruggs I* reading that this Court accepted and quoted on March 3, at 2, leads to a logically and legally absurd result, *viz.*, that Scruggs was infringing at the same time he was using his trait-bearing seeds that became wholly his, free and clear, months before. Exhaustion had freed Scruggs' seeds from Monsanto's patent monopoly at the authorized point of sale, well *before* those seeds began replicating.

---

[5] See Part IV. A. below, beginning at page 14.

[6] *Monsanto Company v. Scruggs*, 459 F.3d 1328, 1336 (Fed. Cir. 2006).

[7] See Part IV. B. below, beginning at page 19.

With respect, this Court should now study this new and emerging contrary authority, deepen its understanding of exhaustion doctrine in the context of the facts of this case, and correct as well its own misreadings of *Quanta* and today's facts.[8] The Court should now grant summary judgment for Scruggs, the Federal Circuit's denial of our Petition for Permission to Appeal notwithstanding.[9]

## II. Recent Judicial Constructions of *Quanta*'s Patent Exhaustion Defense

### A. *Transcore, LP v. Electronic Transaction Consultants Corp.* Illuminates the Meaning of "Initial Authorized Sale" under *Quanta*.

A case just decided by the Federal Circuit confirms the irrelevance of Monsanto's intent regarding its rights to the patented traits embodied in Asgrow's and D&PL's seeds sold to Scruggs. *Transcore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) rejected a patent holder's attempt to introduce parol evidence of the patent holder's and seller's mutual intent to preclude certain downstream uses. The court emphasized that the *only* issue relevant to patent exhaustion is whether sales of patented items are ***authorized***, not whether the patent holder and seller intend, expressly or impliedly, to place restrictions on use of

---

[8] This Court may reconsider its Order of March 3, 2009, as it is one of those that "may be revised at any time before . . . [final judgment]" within Fed. R. Civ. P. 54(b). *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own . . . in any circumstance . . . ."); *Marconi Wireless Co. v. United States*, 320 U.S. 1, 47 (1942) (patent infringement action not final until calculation of damages completed).

[9] *See e.g., In Re Convertible Rowing Exerciser Patent Litigation*, 903 F.2d 822, 822 (Fed. Cir. 1990) ("The granting of the appeal is also discretionary with the court of appeals which may refuse to entertain such an appeal in much the same manner that the Supreme Court today refuses to entertain applications for writs of certiorari.") The Federal Circuit's Order of May 8, 2009, provides that "[t]his order is nonprecedential."

the items. *Id.* at 1277. *Transcore* quotes *Quanta* for the view that "the parties' intent with respect to downstream customers is ***of no moment*** in a patent exhaustion analysis." *Id.* at 1275 (emphasis added). What, if anything, "both knew" is beside the point under proper exhaustion analysis. *Quanta*, 128 S.Ct at 2121-22.

That Monsanto authorized its licensees to sell seed is dispositive of the patent exhaustion issue.[10] Under *Transcore*, Monsanto cannot escape the exhaustion defense by means of its unenforceable wish that its Seed Partners have farmers like Scruggs sign contracts restricting their post-sale uses of the seed. Monsanto assumed the burden of securing separate direct license agreements from farmers and, of course, of enforcing those agreements. Without credible dispute, neither Monsanto, Seed Partner, distributor or anyone else procured from Scruggs a signed contract that he could not replant subsequent generations of the Asgrow 5601 Roundup Ready soybeans bought and paid for in 1996, or of the Paymaster 1220 stacked trait cotton seeds bought and paid for in 1998. Monsanto never procured an enforceable duty from its Seed Partners *requiring* them to procure a "single commercial crop" only license agreement from farmers like Scruggs. That in the mid to late 1990s Monsanto went to so much trouble to have farmers sign contracts banning seed saving is the best evidence that Monsanto well knew its no replant policy was highly problematic under the Patent Act alone.

Similarly, there can be no doubt Monsanto's marketing strategy counsel in the mid-1990s were aware of the patent exhaustion defense and its preclusion of purported downstream restrictions. *Univis Lens* was as good law and as understandable to mid-1990s counsel as it was

---

[10] This view was well settled *before Quanta* or *Transcore*. 5 Chisum on Patents § 16.03[2][a][ii] (2009).

in the eyes of the Supreme Court in 2008. *Quanta*, 128 S. Ct. at 2115-2121. *Met-Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684 (Fed. Cir. 1986) was also available, relying upon and quoting from *Univis Lens*. Being so aware, Monsanto assured its Seed Partners that their licenses would "not be revoked, diminished, or otherwise affected in the event that . . . a court of competent jurisdiction" ultimately ruled as the *Quanta* Court finally did. EV35[11], 41, § 3.10. Monsanto's wish that its Seed Partners to secure no replant contracts with Scruggs is unmasked as precisely the kind of end-run around exhaustion condemned in *Quanta*.

**B.  As *LG Electronics, Inc. v. Hitachi, Ltd.* Demonstrates, the Federal Circuit's Now Vitiated *McFarling* Line of Cases Is No Impediment To This Court's Granting of Summary Judgment in Favor of the Scruggs Defendants.**

*LG Electronics, Inc. v. Hitachi, Ltd.*, 2009 WL 667232 (N.D. Calif. March 13, 2009) declined to follow pre-June 2008 Federal Circuit precedent never mentioned in *Quanta* but inconsistent with it on principle. Specifically, *Hitachi* refused to draw a distinction between authorized domestic sales and authorized foreign sales, though pre-*Quanta* Federal Circuit precedent limited sales protected by exhaustion to those made within the United States. *Hitachi*, 2009 WL 667232 at * 10, citing *Fuji Photo Film Co., LTD v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005).

Of importance here, *Hitachi* noted that "[d]istrict courts may not follow circuit court precedent where a subsequent Supreme Court decision has 'undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.'" *Id.*

---

[11] "EV" refers to the Exhibits Volume [Doc 678] and Supplemental Exhibits Volume [686] filed in conjunction with our Amended Brief in Support of Motion to Reconsider Denial of Summary Judgment in Light of Quanta Computer Clarification of Doctrine of Patent Exhaustion, filed June 26, 2008 and on July 8, 2008, respectively, and the one page Second Supplemental Exhibits Volume filed with today's Motion.

at * 10, quoting *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003). The district court in *Hitachi* acknowledged that "the Supreme Court did not specifically state in *Quanta* that its holding applied to foreign sales" (at *8) but relied on the principle necessarily undergirding *Quanta*'s unequivocal holding that the "authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control post-sale use of the article" *Id.* at * 8, citing 128 S.Ct. at 2122.

*Quanta* eviscerates the Federal Circuit's prior "foreign sales" approach of *Fuji Photo Film*. *Quanta* and *Transcore* clarify that the patent holder's intent regarding downstream use is irrelevant in exhaustion analysis. Similarly, *Quanta* strips away the force of the Federal Circuit's exhaustion rulings in the two *McFarling*,[12] and in *Scruggs I*. As *Quanta* did not need to express its applicability to foreign sales, it did not need to say that transgenic seed traits – or any other particular patented technology – fell well within its teachings.

However one might read the pre-*Quanta* Federal Circuit transgenic seed trait cases, it is plain post-*Quanta* that the replication of seeds is without legal effect where said seeds replicate from seeds that farmer Scruggs bought and owned outright ***before the replication process began***.[13] Nothing in *Quanta* authorizes special rules giving seed trait patent holders a monopoly and right to exclude beyond that afforded patent holders generally. *Quanta* did not have to

---

[12] *Monsanto v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) (*McFarling I*) and *Monsanto v. McFarling*, 363 F.3d 1336, 1343 (Fed. Cir. 2004) (*McFarling II*) are non-exclusive license cases, a fact which leaves the patent infringement reasoning in those cases approaching dicta status.

[13] As the *Static Control Components, Inc. v. Lexmark International, Inc.*, 2009 WL 891811 at * 9 (E.D. Ky. March 31, 2009) opinion, discussed *infra*, notes, even though *Quanta* did not mention a single Federal Circuit case, in holding that patent exhaustion applies to method patents, the Supreme Court clearly overruled Federal Circuit precedent on that issue.

expressly overrule the *McFarling* cases and *Scruggs I* — or even mention them — to undermine their force and effect.[14] *Hitachi* counsels that this Court should no longer adhere to Federal Circuit case law now vitiated by a principled reading of *Quanta*.[15]

### C. *Static Control Components, Inc. v. Lexmark International, Inc.* Illustrates the Proper Approach To Post-*Quanta* Exhaustion Analysis

In its March 3 Order, at 1, this Court said we read *Quanta* "too broadly." *Hitachi* is not the only other court to say such a "broad reading" is exactly what the Supreme Court mandated. *Static Control Components, Inc., v. Lexmark International, Inc.*, 2009 WL 891811 (E.D. Ky., March 31, 2009) was a patent exhaustion case involving sales of toner cartridges containing patented technology. The district court reversed its earlier judgment in favor of the patent holder "because the [Supreme] Court *reasserted a broad understanding of patent exhaustion in the face of Federal Circuit case law that had narrowed the scope of the doctrine.*" *Static Control*, 2009 WL 891811 at * 6 (emphasis added). Concluding that "*Quanta* has changed[16] the landscape of the doctrine of patent exhaustion generally, and specifically the application of the doctrine to the facts of this case," the court opined that *Quanta* "compels" reversal of its earlier ruling that

---

[14] As Tod Leaven points out in his thoughtful article *The Misinterpretation of the Patent Exhaustion Doctrine and the Transgenic Seed Industry in Light of Quanta v. LG Electronics*, 10 N.C.J.L. & Tech 119, 123 (2008), the *LGE* case in the Federal Circuit, which was overturned in *Quanta*, relied upon the same district and circuit court precedent as do the transgenic seed cases. As Leaven points out, while *Quanta* involved computer components, the impact of the opinion extends to any industry that relied upon the lower courts' misinterpretation of patent exhaustion.

[15] The Supreme Court decided *Quanta* with full awareness of its potential impact on the transgenic seed industry. See Brief Amicus Curiae of The American Seed Trade Association in Support of Neither Party at 2-3, *Quanta*, 128 S. Ct. 2109 (No. 06-937).

[16] "Restored" or "reclaimed" would have been better words here. Prior to *Mallinckrodt* in 1992, exhaustion doctrine was essentially what *Quanta* re-established it to be.

Lexmark's infringement claims were not barred by exhaustion. Even after twenty summary judgment motions, almost as many motions for judgment, and a jury trial, the district court recognized that it could not ignore the impact of *Quanta*.

*Static Control* correctly reads *Quanta's* impact on single-use restrictions such as the purported notice that Scruggs and farmers similarly situated were to use the purchased transgenic seed to produce only a single commercial crop.[17] Plaintiff Lexmark's primary theory of infringement rested on its single-use restriction on its printer cartridges. *Static Control, at * 8.* The court refused to enforce Lexmark's post-sale single use restriction sought to be imposed downstream. *Id.* at *12. *Static Control* reads *Quanta* to hold that Lexmark "could *not* preserve its patent rights through a post-sale restriction on an authorized sale, even when the subsequent purchaser was on notice of the asserted patent rights." *Id.* at * 8.[18] (emphasis added).

Similarly, Asgrow's and D&PL's authority to sell seeds embodying Monsanto's patented technology was not conditioned by any notice, printed on the seed bags or otherwise. And nothing in the Monsanto-Asgrow and Monsanto-D&PL license agreements inhibited Asgrow and

---

[17] On March 5, 2009, Lexmark filed a Notice of Authority regarding this Court's disposition of Scruggs' Motion for Reconsideration in light of the *Quanta* decision. See the *Static Control* opinion at * 11-12. The district court distinguished the cases on the basis of the self-replicating nature of seeds but acknowledged that this Court permitted an interlocutory appeal from its Order. Nothing in *Static Control* could or does hold that this Court's March 3 decision was correct. *Static Control's* bone tossed to Lexmark says, in practical effect, "the court has read your new authority. Because it is distinguishable on its facts, the new authority cannot save you from a principled reading of the command of *Quanta*." *Static Control*, at * 9.

[18] In upholding the validity of Lexmark's single use restriction pre-*Quanta*, the district court expressly relied on *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), which involved the sale of a patented medical device accompanied by a "single use only" notice. In reversing this earlier ruling, the court was "persuaded that *Quanta* overruled *Mallinckrodt sub silentio*" because "[t]he Supreme Court's broad statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its specific facts."

D&PL's power to sell and convey to their distributors and thence to farmers who later used the seeds in a manner not contemplated by Monsanto. Lexmark could not preserve its patent rights through a post-sale restriction *even when the subsequent purchaser was on notice of the asserted patent rights.* Similarly, Monsanto cannot rely on Scruggs' purported knowledge that Monsanto preferred he use the purchased seed for a single commercial crop only.

As in *Static Control*, the teaching of *Quanta* is that this Court should disregard the exhaustion doctrine constrictions imposed in *Mallinckrodt,* the *McFarling* cases, and *Scruggs I.*[19] This Court should hold that *as a matter of patent law*, in the absence of enforceable *contractual* restrictions, Scruggs' bought-and-paid-for trait-bearing seeds were freed from Monsanto's patent monopoly — at the latest — at the time of sale to Scruggs. As a matter of law, those seeds and their progeny belonged to Scruggs outright, so that Scruggs enjoyed the "right to use and sell [those seed as he pleased]" *Met-Coil* at 685-86, quoting *Univis Lens*, 316 U.S. at 249.

### III. The Essence of *Quanta*

It is important to understand that patent exhaustion is a congressionally accepted limit on patent monopolies. An established gloss on what is today codified as 35 U.S.C. § 271(a), exhaustion is a full affirmative defense to Monsanto variety claims of infringement.

---

[19] In its Opposition to our Federal Circuit Petition for Permission to Appeal this Court's March 3 Order, Monsanto declared that "[n]o commentator or other authority has ever suggested that *Quanta* might upset this settled law [that utility patents cover subsequent generations of seeds containing the patented trait]. Whether the patents *cover* subsequent generations is beside the point. The pertinent question is whether *restrictions* on those subsequent generations can be enforced as a matter of patent law, rather than contract. And, despite what Monsanto would like to believe, one commentator has stated, "The result of the Court's decision is that members of the transgenic seed industry can no longer avoid patent exhaustion by using complex licensing and sales restrictions, a practice upon which they have come to rely." *See* Leaven, *supra* note 14.

This Court's March 3 Order [731] says *Quanta* stands "only for the unremarkable (and long established) proposition that '[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control post-sale use of the article.'" True enough, the exhaustion defense was established in Supreme Court precedent.[20] The Supreme Court doesn't grant certiorari to reaffirm "unremarkable (and long established) proposition[s]." The Court granted certiorari and issued *Quanta* to reclaim exhaustion doctrine from the erosion it had suffered at the hands of the Federal Circuit dating back to *Mallinckrodt* in 1992, lastly with *Scruggs I* in 2006.[21] It counts for something that *Quanta* struck down the Federal Circuit's grudging view of exhaustion doctrine. Particularly is this so as no pre-2008 Federal Circuit case, not even *Met-Coil*, recognized the nature of the ***authorized sale***, much less its crucial difference from the ***restricted sale.***

What is remarkable about *Quanta* is not its holding as to the exhaustion of LGE's patents (though that holding is a point not seen by the same Circuit Judge who six weeks later cited his own *LGE* opinion in affirming *Scruggs I*, 459 F.3d at 1336). *Quanta* reestablished the vigor of

---

[20] The Supreme Court's first exposition on the law of patent exhaustion was in *Bloomer v. McQuewan*, 55 U.S. 539, 14 L.Ed. 532 (1852). The Court's most recent pre-*Quanta* discussion of the doctrine's contours was *United States v. Univis Lens Co.*, 316 U.S. 241, 86 L.Ed. 1408 (1942). Authorized sales by licensees, such as Seed Partners Asgrow and Delta & Pine Land Co. ["D&PL"], have long been held to take the particular product sold outside the patent monopoly. 5 Chisum on Patents § 16.03 [2][a][ii] (2009).

[21] The retrenchment that began in *Mallinckrodt* culminated on August 16, 2006, with *Scruggs I's* rejection of Scruggs' exhaustion defense, 459 F.3d at 1336, with Judge H. Robert Mayer citing, *inter alia*, the then six-week-old opinion in *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1377 (Fed. Cir. 2006) that he also authored. *Quanta* in turn rejected *LG Electronics'* "conditional sale" approach to patent exhaustion.

principles articulated two-thirds of a century earlier.[22]  After making clear that *Univis Lens* exhaustion doctrine is not limited to discrete factual contexts,[23] *Quanta* applied the broad principles so reinvigorated in the context of today's patented technologies.

*Quanta* makes two primary points:  (1)  An *authorized* sale exhausts the patent holder's rights in the product sold; an unrestricted sale is neither required nor of consequence.  Not even the sometimes sensible *Met-Coil* case admitted that exhaustion follows an ***authorized sale*** without regard to whether that sale may have been ***contractually restricted***.   (2) As noted above, post-sale limits on downstream use of a patented article are a matter of contract only; such contractual restrictions *vel non* have ***no bearing*** on whether a sale ***exhausts the patent***.

Within *Quanta*, Monsanto authorized sales by Seed Partner licensees Asgrow Seed Company and Delta & Pine Land Co. — of Asgrow and D&PL's seeds bearing Monsanto's patented traits.  Those authorized sales exhausted any patent rights Monsanto held in those trait-bearing seeds.[24]   Farmer Scruggs bought these Asgrow and D&PL trait-bearing seeds from distributors Seeds, Inc., and Bunch Farm Service, respectively, in *contractually unencumbered* sales.  *Quanta* holds that purchase of a patented item "carrie[s] with it the right to the use of that 'item' so long as it [is] capable of use." 128 S.Ct. at 2115.  The full extent of use of seeds includes planting them, and thus allowing them to express their innate ability to produce progeny,

---

[22]  And it should count for something that *Univis Lens* decided in 1942 is the exhaustion case Scruggs most prominently cited — and applied to these facts — in its briefing to this Court leading up to 2004 and to the Federal Circuit leading up to *Scruggs I* in 2006.

[23]  All well knew, pre-*Mallinckrodt*, that *Univis Lens* stood for broad general principles. *See, e.g., Met-Coil*, 803 F.2d at 686.

[24]  At pages 9 - 12 of our Amended Memorandum Brief [678] and pages 7 - 8 of our Rebuttal Brief [691] we briefed how this core holding of *Quanta* applies to the matter at hand.

and saving and replanting some of those seeds. *McFarling II*, 363 F.3d at 1342 (acknowledging

that, after planting the first-generation seed to produce a crop, selling and *replanting the harvest*

are practical uses).

*Met-Coil* seems to sense the point. The Court held that "a patent owner's unrestricted

sale of a machine useful only in practicing the claimed inventions" was a relinquishment of the

patent monopoly with respect to that product. *Met-Coil*, 803 F.2d at 685-86. With *Quanta* on

the books, *Met-Coil's* "*unrestricted* sale" must now read "*authorized* sale."[25] As in *Met-Coil,*

"an incident to the purchase of [trait-bearing seed and its germplasm], whether patented or

unpatented, is the right to use and sell it . . . ." *Id.* at 685-86, quoting *Univis Lens*, 316 U.S. at

249. Scruggs bought and paid for trait-bearing seeds and their germplasm in 1996 and again in

1998, whereupon as a matter of law his use of these seeds and their progeny became his business.

The particular seeds that Scruggs bought and that carried those traits, and the germplasm that

caused them to replicate, were "useful only in practicing the claimed inventions."

Whether Scruggs' use of the progeny of the seeds he bought may have been *contractually*

restricted — at the instance of Monsanto or anyone else — is beside the point. They were not.

There is no such contract in this case. That Monsanto is forever in denial does not change the

record or the law. Scruggs made his prima facie case of exhaustion, "shifting the burden of

going forward to [Monsanto. Monsanto has] offered nothing to carry its burden." *Met-Coil*, 803

F.2d at 685.

---

[25] *Met-Coil's* discussion of "notice," 803 F.2d at 687, is also mooted by *Quanta*, 128
S.Ct. at 2121-22.

## IV. **This Court's Misapplications of** *Quanta*

### A. **Monsanto Retained No Enforceable Right Prohibiting Its Seed Partners From Selling To Unlicensed Growers**

#### 1. **The March 3 Order Is Wrong On The Undisputed Facts**

On March 3 this Court sought to distinguish *Quanta* on its facts from the matter at hand. The Court said the agreement between LGE and Intel "was without limitation, e.g. it was an authorized sale," while "the license agreements between Monsanto and its seed partners . . . only permit the sale of seed containing Monsanto's patented biotechnology to <u>licensed</u> growers." Order [731], at 2. *But this is not so at all. On either count.* The contract law legal effect of the LGE-Intel agreement is the same as that of the Monsanto Seed Partner agreements. These errors made March 3 are apparent from reading *Quanta's* description of the LGE-Intel contracts and from reading the actual Monsanto Seed Partner agreements as a whole. [EV 29-35, EV 36-41, EV 45-79].

First, the Court is wrong about what LGE agreed to with Intel. In point of fact, "the [LGE-Intel] License Agreement specifically disclaimed any license to third parties to practice the patents . . . ." *Quanta*, 128 S.Ct. at 2122. Moreover, LGE required "Intel to give notice to its customers, including Quanta, that LGE had not licensed those customers to practice its patents."[26] *Quanta*, 128 S.Ct. at 2121. Neither the disclaimer of third party licenses nor the notice required in LGE's license with Intel was enough to save LGE's patent monopoly. "Intel's *authority* to sell its products embodying the LGE Patents was not conditioned on notice [that

---

[26] This is comparable to the bag notice requirements in the Monsanto-DPL agreement, § 3.6, EV 34, 39; and in the Monsanto-Asgrow License Agreement, § 3.6, EV51, each of which under *Quanta* is of no force or effect to avoid Scruggs' exhaustion defense.

LGE had not licensed those customers to practice its patents] or Quanta's decision to abide by LGE's directions in that notice." *Quanta*, 128 S.Ct. at 2122.

Similarly, the Asgrow and D&PL license agreements expressly disavow any notion that Monsanto holds a legal right to enforce — against either Asgrow or D&PL — its aspiration that these Seed Partners[27] sell "only . . . to <u>licensed</u> growers."[28] Monsanto's intent in this regard is rendered irrelevant by *Transcore*, 563 F.3d at 1275, one of the new cases discussed above. Within Rule 54(b), we suggest with respect that a mistake of this dimension justifies "revis[ing]" the March 3 Order "at any time before . . . [final judgment]," even without the new authority discussed below.

### 2. The March 3 Order Is Wrong On *Quanta's* Effect On The Uncontradicted Facts

*Quanta* teaches that, ***as a matter of patent exhaustion law***, the "established fact that Scruggs did not have a license" avails nothing. By definition, no buyer of a patented product mounting a successful exhaustion defense has a license. There is no need to go to the trouble of pleading and proving exhaustion if you have a license. Just as Intel's authority to sell products was not conditioned upon Quanta's decision to act in accordance with LGE's wishes, *Quanta*,

---

[27] Though Monsanto owns both Asgrow and D&PL now, it did not own either at the time of the sales in questions. Those sales were authorized by the license agreements tendered with the Exhibits Volume filed in the Summer of 2008. [EV 29-35, EV 36-41, EV 45-79] [Doc 678, 686]

[28] Monsanto-Asgrow License Agreement, § 3.9(f), EV53 ("shall not be considered a breach of this Agreement by ASGROW"); also § 3.9(a), EV49; MTC/D&M/D&PL, INSECT-PROTECTED COTTON LICENSE, § 3.10, EV40 ("shall not be considered a breach of this Agreement [by D&PL]"); also §§ 3.9 - 3.11, EV 35-41.

128 S.Ct. at 2122, the authority of Seed Partners Asgrow and D&PL to sell seeds that embodied Monsanto's patented traits [and the germplasm to self-replicate] was not conditioned on

(1)     Whether Asgrow and/or D&PL policed their downstream seed distributor, Seeds, Inc., to be certain that it sold seeds only "to <u>licensed</u> growers;" or

(2)     Whether Asgrow and/or D&PL held enforceable contracts with downstream seed distributor, Seeds, Inc., invalidating *ab initio* seed sales "to <u>unlicensed</u> growers;" or

(3)     Whether Seeds, Inc., and/or Bunch Farm Service extracted from Scruggs contracts licensing to Scruggs the right to use the seeds at all, or limiting the uses he might make; or

(4)     Whether Scruggs' decided to abide by Monsanto's preferences about how the seed and traits could be used in the first or subsequent generations of those seeds.

It is by no means clear that today's outcome would be different even if Monsanto had held with Asgrow and/or D&PL enforceable contracts invalidating *ab initio* subsequent downstream seed sales by Asgrow and/or D&PL distributors "to <u>unlicensed</u> growers," although, of course, no such contract is a part of the record in this case.

### 3. The Common Sense Of Asgrow/D&PL's Authority At The Time Of Sale

As a matter of common sense, authority must exist at the time a sale is made, else there is no sale. Monsanto gave Asgrow sale authority every bit as fully as LGE had given sale authority to Intel. Monsanto-Asgrow License Agreement, § 3.1, EV49. Neither Asgrow, nor Seeds, Inc., could have known at the time of sale in the Winter of 1995-96 what would be done — in the Fall of 1996 or thereafter — with the Roundup Ready soybean seeds they sold to Scruggs, much less what would be done with the inevitable progeny of those soybeans. And so it makes sense that

Monsanto put nothing in its Seed Partner license agreements invalidating *ab initio* seed sales that may have later been made "to <u>unlicensed</u> growers." Nothing before the Court suggests Scruggs even knew what he would do at the time he bought those Asgrow 5601 Roundup Ready soybeans from Seeds, Inc.[29] Worry about the future may have moved Monsanto or Asgrow or, in turn, Seeds, Inc., to get a contract with Scruggs, but no such contact was taken.

Again, authority to make a sale necessarily must exist at the time the sale is made. The record before the Court contains no basis for denying — in law or in fact — that such authority existed immediately before and at the time Asgrow/D&PL, and then Seeds, Inc., and Bunch Farm Service made contractually unencumbered sales of trait-bearing seeds to Scruggs.

It matters not whether by contract Monsanto could have imposed on Asgrow an enforceable condition — enforceable against Asgrow, that is — that it sell only "to <u>licensed</u> growers," Order [731], at 2, and invalidating *ab initio* seed sales that may be made "to <u>unlicensed</u> growers." In point of fact, Monsanto only required that "ASGROW shall make all reasonable efforts to have each of its dealers and distributors comply with such agreements." Monsanto-Asgrow License Agreement, § 3.9(a), EV49. Moreover, Monsanto told Asgrow that its failure in such "reasonable efforts" "shall not be considered a breach of this Agreement by ASGROW unless ASGROW encourages its dealers or distributors to breach such obligations." Monsanto-Asgrow License Agreement, § 3.9(f), EV53. Even if Monsanto had evidence of such

---

[29] 1996 was the first year Roundup Ready soybeans were sold commercially, and Seeds, Inc., prevailed upon Scruggs to try out the new trait bearing seeds to see how they worked. [Transcript of Mitchell Scruggs Deposition, February 13, 2001 at 103; Mitchell Scruggs Affidavit, March 29, 2001. [EV 18-28]

"encourage[ment]," that would afford a remedy only against Asgrow, while in no way

invalidating *ab initio* seed sales made to Scruggs.

A like analysis of the (lack of) prescience of Monsanto or D&PL or Seeds, Inc. or Bunch

Farm Service, prior to the 1998 planting season,[30] makes clear the good sense of *Quanta's* focus

upon "authorized sales," not "unrestricted sales," of Bollgard Roundup Ready cotton seeds or any

other products that substantially embodied the patented inventions. *Quanta*, 128 S.Ct. at 2121-

22. [EV13-14]. If anything, D&PL had greater authority and Monsanto had fewer rights than in

the Monsanto-Asgrow License Agreement.[31] Again, no rights Monsanto may have had against

D&PL affects the validity of sales made to Scruggs.

### 4. Monsanto's Own Actions Underscore This Court's "Only . . . to Licensed Growers" Error

The dead give away here is that Monsanto has never sued Scruggs for his first year uses,

1996 for the Asgrow 5601 Roundup Ready soybeans, and 1998 for the D&PL produced

Paymaster 1220 Bollgard Roundup Ready "stacked trait" cotton seeds.[32] This can only be

---

[30] Essentially identical authorizing wording appears in MTC/D&M/D&PL, ROUNDUP READY COTTON LICENSE, § 3.2, EV30-31, and in the MTC/D&M/D&PL, INSECT-PROTECTED COTTON LICENSE, § 3.2, EV37.

[31] MTC/D&M/D&PL, INSECT-PROTECTED COTTON LICENSE, §§ 3.9 - 3.11, EV 40-41; MTC/D&M/D&PL, ROUNDUP READY COTTON LICENSE, §§ 3.9 - 3.11, EV35.

[32] The Complaint and each Amended Complaint make no claim of infringement for uses Scruggs made in 1996, when he had no formal license from Monsanto for use of the Roundup Ready soybean trait product, or in 1998, when he had no formal license from Monsanto for use of the Bollgard and Roundup Ready cotton trait products. Monsanto's Third Amended Complaint, paragraph 29 [420]; *Monsanto Co. v. Scruggs*, 342 F.Supp.2d 584, 588-589 (N.D. Miss. 2004); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1333 (Fed. Cir. 2006); Expert Report of Mark E. Hoffman, 9/2/2008, pages 21 - 24.

because Monsanto understood from *Univis Lens* well before *Quanta* that exhaustion doctrine protected Scruggs in those years, though he is one of those "[un]licensed growers."

Even in its Opposition to our Federal Circuit Petition for Interlocutory Appeal, Monsanto confirms that "Monsanto's patent infringement claims relate *only* to second- and later-generation saved seed that was never sold, but which Scruggs made and used [allegedly] without authority."[33] Monsanto's failure to claim that Scruggs' first year uses were infringing uses strips away any legal consequence from this Court's factually erroneous point that "the license agreements between Monsanto and its seed partners . . . only permit the sale of seed containing Monsanto's patented biotechnology to <u>licensed</u> growers." Order [731], at 2.

### B. Patent Act Exhaustion Ends Monsanto's Patent Monopoly In Those Seeds And Freed Scruggs To Use His Seeds As Fully As He Wished

#### 1. Under State Law A Farmer Owns The Progeny Of His Livestock And Of His Seeds

Seeds are personal property.[34] In authorized sales, as aforesaid, Scruggs acquired title to, and all of the incidents of ownership of, the seeds he purchased in 1996 and 1998, respectively, fully and without contractual restrictions. As a matter of state law, Scruggs also owned outright the progeny of the seeds he bought and paid for.

The contractually uninhibited seed saving farmer's rights are analogous to his absolute rights in the offspring of his livestock. *See, e.g., Carruth v. Easterling*, 150 So.2d 852, 855

---

[33] Respondent's Opposition to Petition Under 28 U.S.C. section 1292(b) at p. 12. Misc. Docket No. 900.

[34] *See, e.g., ABC Finance Corp. v. Auditor of Public Accounts*, 339 So.2d 555, 556 (Miss. 1976) (seeds are personal property); *Rutherford v. State*, 17 So.2d 803, 803 (Miss. 1944) (same); *Yates v. State*, 161 So. 147, 147 (Miss. 1935) (same).

(Miss. 1963) ("The general rule, in the absence of an agreement to the contrary, is that the offspring or increase of tame or domestic animals belongs to the owner of the dam or mother . . . . In this respect the common law follows the civil and is founded on the maxim, '*partus sequitur ventrem*' . . . . Furthermore, the increase of the increase, *ad infinitum*, of domestic animals comes within the rule and belongs to the owner of the original stock"); *cf. U.S. v. Southeast Mississippi Livestock Farmers Ass'n*, 619 F.2d 435, 439 (5th Cir. 1980), applying Mississippi law, holding that a lender's perfected security interest extended to the offspring of hogs, notwithstanding the omission of the words "increases" or "offspring" from the parties' financing statements. Nothing in this Court's March 3 Order questions this simple and sufficient legal premise.

## 2. Scruggs Already Owned Outright the Progeny of His First Generation Trait-Bearing Seeds Free and Clear of the Patent Monopoly

On March 3, this Court invoked the Federal Circuit's end run around exhaustion, *viz.*, "'[w]ithout the actual sale of the second generation seed to Scruggs, there can be no patent exhaustion,'" citing *Scruggs I*, 459 F.3d at 1336, which in turn quotes *McFarling I*, 302 F.3d at 1299. But this was before *Quanta*. Scruggs already owned his first generation trait-bearing seeds free and clear of Monsanto's patent monopoly and right to exclude. Long before the first seed was saved, state law included within Scruggs' "free and clear" right the progeny of those first generation seeds. This vested personal property right leaves no occasion to consider whether there may have been an "actual sale of the second generation seed to Scruggs."

The legislative fact underpinning of the common law livestock increase rule just noted is even stronger in the case of seeds. While male and female livestock will only probably mate,

-20-

cotton seeds and soybeans planted in the fields will by, a process of nature, replicate come hell or high water.[35] This takes the process of replication outside the Patent Act. *See, e.g., J.E.M. Ag Supply Co. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 130, 134 (2001) (distinguishing non-patentable "products of nature" from patentable "human-made inventions"). The same exhaustion that took Scruggs' unlicensed use of the trait-bearing seeds in 1996 and 1998 outside the patent monopoly was legally sufficient to protect his use of the inevitable progeny of those legally protected first year uses.

This view of exhaustion's gloss on Section 271(a) [see next subparts] is nothing more than the way statutes are read in the context of technological advances.[36] This rule of

---

[35] There is a touch of naivete in the Federal Circuit's false truism, *viz.*, "[t]he fact that a patented technology *can* replicate does not give a purchaser the right to use replicated copies of the technology." *Scruggs I*, 459 F.3d at 1336, quoted in this Court's March 3 Order [731], at 2. [emphasis supplied]

[36] *Wirth Limited v. S/S Acadia Forest*, 537 F.2d 1272 (5th Cir. 1976) construed the term "ship" within the Carriage of Goods by Sea Act regarding a type of barge that did not exist at the time Congress enacted COGSA in 1936. "Our principal task in this case is to determine what Congress would have thought about a subject about which it never thought or could have thought and one about which we have never thought nor any other Court has thought." 537 F.2d at 1276. The court deemed the barge in question a "ship" within the meaning of the statute. *Id.* at 1283. To hold otherwise would defeat the COGSA's stated policy objectives of protecting carriers engaged in foreign trade against all-encompassing liability while safeguarding shippers' interest in maintaining the seaworthiness of their vessels. *Id.* at 1279. See also *Commonwealth v. Gousie*, 2001 WL 1153462 (Mass.Super.), rejecting criminal defendant's argument that computer transmitted images are not "visual material" within the meaning of a child pornography statute, holding the terms "picture" and "photograph" must be allowed reasonably to reflect technological advances. 2001 WL 1153462 at * 4.
Per Justice Holmes, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425 (1918). It would be absurd in the extreme that the Patent Act, ostensibly enacted to encourage technological advances, were not read so as to accommodate all of its parts — including exhaustion doctrine — to that not foreseen at the time of enactment.

construction reads 35 U.S.C. § 101 liberally in favor of patentability, *J.E.M. Ag Supply Co. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 130, 135 (2001). On principle the rule reads at least as liberally as needed, that a buyer's use following exhaustion be as full as the natural capabilities of the product sold. Monsanto sought the advantages of the technologically advanced herbicide tolerant and insect resistant traits in seeds. It chose to insert those traits into naturally replicating seeds, and sought the protection of the Patent Act.

But that same Patent Act brought with it — and burdened Monsanto's patent monopoly with — the defense of patent exhaustion which makes clear that "an incident to the purchase of [trait-bearing seed and its germplasm], whether patented or unpatented, is the right to use and sell it . . . ." *Met-Coil,* at 685-86, quoting *Univis Lens*, 316 U.S. at 249. *Quanta* reenergizes the rule that purchase of a patented item "carrie[s] with it the right to the use of that 'item' so long as it [is] capable of use." 128 S.Ct. at 2115. Nothing in the Patent Act limits "use" of natural progeny of exhausted seed sales to anything less than full rights of use enjoyed under state law. The use of self-replicating trait-bearing seeds bought and paid for in 1996 and 1998, respectively, extends at least through 2000, and as long thereafter as the laws of nature leave them useful.

### 3. *Scruggs I* Leads To The Absurd Result That Scruggs Is Infringing As He Uses Trait-Bearing Seeds Upon Which The Patent Monopoly Has Been Exhausted

The Federal Circuit proves too much when it argues in *Scruggs I*, 459 F.3d at 1336, that the natural and inevitable genesis of progeny of the original seeds represents a new infringement. Upon Scruggs' uses in 1996 and 1998, those soybeans and cotton seeds produced second generation seeds as determined by their nature, whether Scruggs wanted them to or not. If the law supposes that such a certain and unavoidable natural production of progeny becomes a new

infringement, then the law should be regarded as Mr. Bumble regarded it.[37] The Patent Act is not

exempt from the familiar injunction that no act of the Congress will be construed and applied to

produce an objectively absurd result, absent express and unequivocal statutory language.[38] No

such wording appears in 35 U.S.C. § 271(a)[39] or any other part of the Patent Act. If, under

today's facts, natural and inexorable replication is a new infringement, *i.e.,* a new "making,"

Scruggs is infringing at the same time he is using what exhaustion doctrine says he may use

freely. Scruggs' rights recognized in *Quanta* exhaustion are in practical effect annulled. This is

a legal absurdity that no court should countenance absent the clear command of the Congress.

It is no answer that Monsanto is not here claiming infringement until second generation

seeds were planted. If the *Scruggs I* view obtains, Monsanto's withholding suit while Scruggs'

trait-bearing seeds are "making" naturally is a grant of unenforceable grace. Monsanto could

withdraw that grant of grace and sue the next day. If second generation seeds infringe, the

---

[37] Charles Dickens, <u>Oliver Twist,</u> ch. 51, p. 489 (1970 ed.; first published 1837-39).

[38] The "absurdity" doctrine has been recognized in many cases over many years. *See, e.g., EEOC v. Commercial Office Prod. Co.*, 486 U.S. 107, 120 (1988) ("this Court need not and should not countenance" "interpretation of [statute that] leads to 'absurd and futile results.'"); *U. S. v. Turkette*, 452 U.S. 576, 580 (1981) ("absurd results are to be avoided"); *U. S. American Trucking Ass'n*, 310 U.S. 534, 543 (1940) (When "plain meaning . . . has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act."); *U. S. v. Ryan*, 284 U.S. 167, 175 (1931) ("literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose.")

[39] Accepted principles of statutory interpretation require that the exhaustion doctrine be accommodated in applying Section 271(a)'s rules of infringement. As noted above, the law of exhaustion doctrine dates back to the case of *Bloomer v. McQuewan*, 55 U.S. 539, 14 L.Ed. 532 (1852). *Quanta* traces the history of exhaustion. The Congress has revisited Section 271 repeatedly over the years. *Quanta* establishes that exhaustion doctrine is alive and well, restored to the vigor it had enjoyed since 1942 in *Univis Lens.*

natural and inevitable "making" thereof must *per force* be an infringement within Section 271(a)

from the moment of development of the seed by the plant, including flowering and pollination —

all natural processes that not even Monsanto can stop. Section 271(a) extends to unauthorized

"making," "use," "offers to sell," and "sale." No law or legal logic at once protects the

purchaser's new "making" within *Quanta's* exhaustion gloss on Section 271(a), but leaves his

"use," "offers to sell," and "sale" subject to infringement liability at the whim of the patentee.

Nor can a woman be a little bit pregnant.

### 4. Accepted Rules Of Statutory Interpretation Undermine *Scruggs I*

This Court and the Federal Circuit have overlooked another premise well settled in the

law of statutory interpretation. Exhaustion doctrine is an accepted gloss (1) on the reach of the

Patent Act, (2) on the limits of the monopoly it confers, and (3) specifically, limits 35 U.S.C. §

271(a) which lists acts deemed to infringe.[40]  Over the years, the Congress has repeatedly

---

[40] In *Cornell University v. Hewlett-Packard Co.*, 2008 WL 5671886 (N.D.N.Y. 2008), U. S. Circuit Judge Randall R. Rader of the Court of Appeals for the Federal Circuit, sitting by designation, confirmed that patent exhaustion acts as a limitation on 35 U.S.C. § 271(a) infringement. Judge Rader noted that the Supreme Court has recognized that patent exhaustion "has its roots in the patent law statutory framework." 2008 WL 5671886 at * 1 citing *Bloomer v. McQuewan*, 55 U.S. 539, 549 (1852) ("When he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the patent confers.") In other words, under patent exhaustion, a patentee abandons its statutory right to exclusivity through an authorized sale or license of its patent. *Hewlett-Packard Co. v. Repeat-O-Type Stencil*, 123 F.3d 1445, 1451 (Fed. Cir. 1997).

*LG Electronics, Inc. v. Asustek Computer, Inc.* et al 2002 WL 31996860 at * 3 (N.D. Cal. Aug. 20, 2002), explained that exhaustion doctrine "is derived from the statutory grant of exclusivity to the patent. Once a patentee abandons its statutory right to exclusivity through the sale of a patented product or the license of the patent itself, there is no statutory basis for the patentee to impose restrictions or secure royalties on the subsequent use of the invention. *Quanta* restored the district court's view, after the Federal Circuit had reversed. *LG Elecs. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006).

revisited what is now Section 271(a), all while exhaustion doctrine was well established (at least in the Supreme Court). On none of these occasions has the Congress moved to eliminate or restrict exhaustion doctrine dating back at least to 1852. Congress is presumed aware of judicial interpretations of a statute and, when it reenacts a statutory language without material change, adopts those interpretations. *Lorillard v. Pons*, 434 U.S. 575, 580-581 (1978). When Congress reenacts a statute which the courts have interpreted in a consistent manner, that reenactment carries forward all settled judicial constructions. *Pierce v. Underwood*, 487 U.S. 552, 566-567 (1988). The Supreme Court reaffirmed this view of statutory interpretation as recently as June 24, 2009, in *Forest Grove School Dist. v. T. A.*, 2009 WL 1738644, at *6 (2009). *See also,* 2A Sutherland, Statutes and Statutory Construction § 48A:11 (7th ed. 2009). As all of this is so, exhaustion may only be seen as a congressionally accepted limitation on the patent monopoly and the patent holder's right to sue for infringement.

Applying garden variety statutory interpretation to this case hardly "eviscerate[s] the rights of the patent holder," *Scruggs I*, 459 F.3d at 1336, quoted in this Court's March 3 Order [731], at 2. Monsanto had every opportunity to try by contract to secure the rights it claims. Not only did Monsanto not contract with farmer Scruggs. Monsanto did not even take enforceable rights from Asgrow or D&PL that they could sell "only . . . to <u>licensed</u> growers," Order [731], at 2. Public policy forbids distorting congressionally approved exhaustion doctrine to give Monsanto benefits readily available to it by contract; the Lord and the law help those who help themselves. *Scruggs I* is trying too hard, and fails in the court of common sense. If the end of the Patent Act is avoiding "eviscerat[ion of] the rights of the patent holder," one year's use with impunity does that. Not even Monsanto denies that exhaustion permits one year's use.

## 5. The Monsanto and *Scruggs I* View of Exhaustion Founders on the Facts

*Quanta* exhaustion fairly applied to today's facts ends this case. Monsanto's patents claim no seeds or plants,[41] or the germplasm thereof, much less the process of seed replication. *J.E.M. Ag Supply*, 534 U.S. at 130, 134. Monsanto's marketing strategy assured farmers they owned their seeds, *viz., "The farmer owns the seed, and Monsanto owns the technology."* EV 80. Monsanto must take the bad with the good. It cannot backdoor an exhaustion avoidance from the natural process of replication that it used to advantage to produce and market its patented inventions. Use is use, whether the patent holder or the purchaser is doing the using. Patent rights not enforceable upon Scruggs' use of his wholly bought, paid for and owned original batches of seeds do not rise like the phoenix when *seeds*, upon which Monsanto has no patent, naturally replicate.

Nor do the genes, plasmids, vectors, DNA constructs and chimeric transcriptional initiation regions claimed in Monsanto's patents have any inherent ability to self-replicate. These can replicate only through the actions of enzymes and the chemical building blocks of genes, plasmids, vectors, cells, DNA constructs and chimeric transcription initiation regions that are not described or claimed in any of Monsanto's four patents in suit. The claimed inventions will only replicate where, as here, their sequences and signals are acted upon by cellular replication

---

[41] *McFarling II*, 363 F.3d at 1343, makes clear Monsanto's prior claims to seeds stem exclusively from the '435 patent, withdrawn from this case by Order of June 16, 2004 [597]. No claim in the '605 patent or the three McPherson patents ['316, '515 or '938] comes close to claiming "seeds" much less "plants." The '605 patent claims only genes, vectors, plasmids and cells. The '316 patent claims only plant cells. The '525 patent claims only a DNA construct. The '938 patent claims only a "chimeric transcriptional initiation region." These claims are on the last two pages of each patent, these being Exhibits B, C, D, and E, respectively, to the Complaint.

machinery claimed in no patent and not even patentable. The initial authorized sale exhausted Monsanto's patents and takes outside the patent monopoly Scruggs' post-sale downstream use of his seeds, their inexorable natural progeny, and their naturally inert genes, plasmids, vectors, cells, DNA constructs and chimeric transcriptional initiation regions. *Quanta*, 128 S.Ct. at 2115.

## V. <u>Conclusion</u>

With respect, the Court should revisit the interlocutory order [731] denying Scruggs' Motion For Summary Judgment [613]. The Court should hold that, in its *Quanta* decision, the Supreme Court is "controlling authority [which] has since made a contrary decision of the law applicable to such issues." *White v. Murtha*, 377 F.2d 428, 431-432 (5th Cir. 1967). Having done so, this Court should then grant Scruggs' motion for summary judgment and dismiss Monsanto's Complaint in its entirety and with prejudice.

Respectfully submitted this the 2nd day of July, 2009.

MITCHELL SCRUGGS; ET AL.

BY:   /s/ James L. Robertson
        JAMES L. ROBERTSON, MSB 5612
        PAUL E. BARNES, MSB 99107
        LINDA F. COOPER, MSB 102901
        Post Office Box 651
        Jackson, MS 39205
        jlr@wisecarter.com
        peb@wisecarter.com
        lfc@wisecarter.com

OF COUNSEL:

James D. Waide, III, Esq.
WAIDE & ASSOCIATES, P. A.
Post Office Box 1357
Tupelo, MS 38802
Telephone: (662) 842-7324
waide@waidelaw.com

Dennis C. Sweet, III, Esq.
Sweet & Associates
Post Office Box 1178
Jackson, MS 39215
Telephone: (601) 965-8700
dennis.sweet@sweetandassociates.net

Prof. Gary Myers
1012 South Lamar Street
Oxford, MS 38655
Telephone: (662) 801-3152
myersgroup@yahoo.com

WISE CARTER CHILD & CARAWAY
Post Office Box 651
Jackson, MS 39205
Telephone: (601) 968-5500
Facsimile: (601) 968-5593

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that I, James L. Robertson, one of the attorneys for the Defendants,

Mitchell Scruggs, et al., have this date served a true, correct and exact copy of the foregoing, via

ECF, upon the following persons:

Michael N. Watts, Esq.
Holcomb Dunbar, P.A.
Post Office Drawer 707
Oxford, MS   38655-0707
mwatts@holcombdunbar.com

Joseph C. Orlet, Esq.
Erik L. Hansell, Esq.
Husch Blackwell & Sanders, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO   63105-3441
joseph.orlet@huschblackwell.com
erik.hansell@huschblackwell.com

Frank S. Thackston, Jr., Esq.
Lake Tindall LLP
Post Office Box 918
Greenville, MS   38702-09181
fthackston@ltindall.com

Edward Blackmon, Jr., Esq.
Blackmon & Blackmon, PLLC
Post Office Drawer 105
Canton, MS   39046
edblackmon@blackmonlawfirm.com

This the 2nd day of July, 2009.

/s/ James L. Robertson
JAMES L. ROBERTSON