No. 07-___

IN THE
Supreme Court of the United States

HOMAN MCFARLING,
*Petitioner,*

v.

MONSANTO COMPANY,
*Respondent.*

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Federal Circuit**

**PETITION FOR A WRIT OF CERTIORARI**

MARK A. LEMLEY
*Counsel of Record*
STEVEN A. HIRSCH
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 676-2286

ALAN B. MORRISON
1937 Biltmore Street NW
Washington, DC 20009
(202) 506-6744

JIM WAIDE
WAIDE & ASSOCIATES
332 N. Spring Street
Tupelo, MS 38802-1357
(662) 842-7324

*Counsel for Petitioner*

i

## QUESTIONS PRESENTED

(1)     In determining a "reasonable royalty" under the patent-damages statute, 35 U.S.C. § 284, may the factfinder award the patentee either:

(a)     a hypothetically negotiated royalty that vastly exceeds the established royalty charged in the marketplace, or

(b)     a royalty that includes damages to the patentee's third-party distributors and is intended to force the infringer to disgorge his profits— even though Congress eliminated the equitable-disgorgement remedy in 1946?

(2)     Do the doctrines of patent exhaustion and patent misuse permit the purchaser of a patented good to use that good and dispose of its products as it sees fit, absent a valid contract?

## RULE 29.6 STATEMENT

Pursuant to Supreme Court Rule 29.6, petitioner states that he has no parent companies or nonwholly owned subsidiaries.

iii

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ........................................ i

RULE 29.6 STATEMENT........................................... ii

PETITION FOR A WRIT OF
CERTIORARI ...................................................1

OPINIONS BELOW...................................................1

JURISDICTION .........................................................1

STATUTORY PROVISIONS INVOLVED .................1

STATEMENT OF THE CASE....................................3

REASONS FOR GRANTING THE
PETITION .........................................................9

I.   The Federal Circuit has rewritten
the patent-damages statute to
provide patent owners with a
remedy that far exceeds the amount
"adequate to compensate for the
infringement.".................................................9

   A.   *McFarling III* violates the
rule that an established
royalty generally precludes
the use of a hypothetical one...............11

   B.   By awarding the patent owner
damages incurred by third-

iv

# TABLE OF CONTENTS

**Page**

party distributors, *McFarling III* violates standing principles and the rule against equitable disgorgement of infringer profits. ...................................................16

1. *McFarling III* violates the standing rule that a litigant cannot recover damages for others' losses..........................................17

2. Forcing McFarling to disgorge the benefits of his infringement—*i.e.,* his nonpayment of the Seed Company Fee— injects an improper "deterrence" rationale into § 284 and violates its rule against equitable disgorgement of infringer profits......................19

II. The Federal Circuit has improperly broadened patent rights by vitiating the doctrine of patent exhaustion..................22

CONCLUSION.........................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Burke,*
84 U.S. 453 (1873).............................................. 23

*Aro Manufacturing Co. v. Convertible Top Replacement Co.,*
377 U.S. 476 (1964)..................................... 20, 21

*Buise v. Hudkins,*
584 F.2d 223 (7th Cir. 1978)............................. 18

*Clark v. Wooster,*
119 U.S. 322 (1886)............................................ 11

*Coupe v. Royer,*
155 U.S. 565 (1895)........................................... 19

*GM Corp. v. Devex Corp.,*
461 U.S. 648 (1983)........................................... 21

*Hanson v. Alpine Valley Ski Area, Inc.,*
718 F.2d 1075 (Fed. Cir. 1983).................. 12, 13

*Hughes Aircraft Co. v. U.S.,*
86 F.3d 1566 (Fed. Cir. 1996).......................... 13

*Jurgens v. CBK, Ltd.,*
80 F.3d 1566 (Fed. Cir. 1996)........................... 20

# TABLE OF AUTHORITIES

**Page(s)**

*Keeler v. Standard Folding-Bed Co.,*
   157 U.S. 659 (1895)............................................ 26

*Mahurkar v. C.R. Bard, Inc.,*
   79 F.3d 1572 (Fed. Cir. 1996) ........................... 13

*Mallinckrodt, Inc. v. Medipart, Inc.,*
   976 F.2d 700 (Fed. Cir. 1992) ........................... 25

*Marconi Wireless Telegraph Co. of America
   v. United States,*
   53 U.S.P.Q. 246 (Ct. Cl. 1942) ......................... 17

*Marvel Specialty Co. v. Bell Hosiery Mills, Inc.,*
   386 F.2d 287 (4th Cir. 1967).............................. 13

*Monsanto Corporation v. Scruggs,*
   459 F.3d 1328 (Fed. Cir. 2006) ......................... 27

*Monsanto v. McFarling,*
   363 F.3d 1336 (Fed. Cir. 2004) ................... 14, 28

*Monsanto v. Ralph,*
   382 F.3d 1374 (Fed. Cir. 2004) ......................... 14

*Moose Lodge No. 107 v. Irvis,*
   407 U.S. 163 (1972)........................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

*Motion Picture Patents Co. v. Universal Film Manufacturing Co.,*
243 U.S. 502 (1917)............................................ 25

*Nickson Industrial, Inc. v. ROLM Manufacturing Co.,*
847 F.3d 795 (Fed. Cir. 1988)..................... 11, 14

*Philip Morris USA v. Williams,*
127 S. Ct. 1057 (2007)....................................... 18

*Rude v. Wescott,*
130 U.S. 152 (1889)............................................ 12

*Trans World Airlines, Inc. v. Thurston,*
469 U.S. 111 (1985)............................................ 18

*Trell v. Marlee Elecs. Corp.,*
912 F.2d 1443, *id.* at 1446 ............................... 13

*Trio Process Corp. v. L. Goldstein's Sons, Inc.,*
612 F.2d 1353 (3d Cir. 1980) ............................ 14

*United States v. Univis Lens Co.,*
316 U.S. 241 (1942)................................ 23, 24, 26

## TABLE OF AUTHORITIES

**Page(s)**

*Warth v. Seldin,*
   422 U.S. 490 (1975)............................................. 18

## STATUTES

15 U.S.C. § 15(a)...................................................... 20

35 U.S.C. § 271(d)...................................................... 1

35 U.S.C. § 284.................................................*passim*

28 U.S.C. §1254(1)...................................................... 1

## MISCELLANEOUS

*Arthur J. Gajarsa et al., How Much Fuel to
   Add to the Fire of Genius? Some Questions
   About the Repair/Reconstruction Distinc-
   tion in Patent Law,* 48 Am. U. L. Rev. 1205
   (1999)................................................................. 27

7 Donald S. Chisum, *Chisum on Patents*
   §20.01, at 20-7 (2002) ........................................... 9

## TABLE OF AUTHORITIES

Page(s)

James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts About the CAFC's Mallinckrodt Decision*, 75 J. Pat. & Trademark Off. Soc'y 550 (1993).................. 27

Keith Aoki, *Weeds, Seeds & Deeds: Recent Skirmishes in the Seed Wars*, 11 Cardozo J. Int'l & Comp. L. 247 (2003) ........................... 28

Peter Carstensen, *Post-Sale Restraints via Patent Licensing: A "Seedcentric" Perspective*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1053 (2006) ........................................ 27

Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine in U.S. Patent Law: Mallinckrodt v. Medipart*, 15 Eur. Intell. Prop. Rev. 460 (1993) ................................ 27

Scott A. Chambers, *Exhaustion Doctrine in Biotechnology*, 35 IDEA 289 (1995)................. 27

Thomas Arno, *Use Restrictions and the Retention of Property Interests in Chattels Through Intellectual Property Rights,* 31 San Diego L. Rev. 279 (1994) ........................... 27

13 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3531.9 (2007)................................................................ 18



## PETITION FOR A WRIT OF CERTIORARI

### OPINIONS BELOW

The published opinion of the Court of Appeals (App. 1a-17a) is available at 488 F.3d 973. The unpublished opinion of the District Court (App. 18a-32a) is available at 2005 WL 1490051.

Prior opinions in the case are set out at App. 33a-137a.

### JURISDICTION

The Court of Appeals' judgment was entered on May 24, 2007. The jurisdiction of this Court is invoked under 28 U.S.C. §1254(1).

### STATUTORY PROVISIONS INVOLVED

The patent-damages statute, 35 U.S.C. § 284 (2007), states in part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 271(d) partially codifies the patent-misuse doctrine and states:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having

done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

## STATEMENT OF THE CASE

1. Petitioner Homan McFarling operates a farm in Pontotoc County, Mississippi. (App. 109a). In 1998, McFarling purchased Monsanto's Roundup Ready soybean seeds from a seed company. (App. 4a). Roundup Ready seeds are genetically modified to be resistant to glyphosphate, the active ingredient in Monsanto's Roundup herbicide. (App. 2a-3a). Using the two products together allows farmers to kill weeds but not crops. (App. 2a-3a).

The genetic modifications in the Roundup Ready seeds are the subject of two Monsanto patents, the '435 and the '605 patents. (App. 2a-3a). Monsanto distributed the seeds through seed companies, some of which it owned and some of which were independent. (App. 3a, 10a). Monsanto required the seed companies to obtain a signed "Technology Agreement" from buyers. Among other things, the Agreement required farmers not to replant seeds produced from the purchased seeds or to supply those seeds to others for replanting. (App. 3a). Farmers paid Monsanto a "Technology Fee" of $6.50 per 50-pound bag of soybean seed and also paid the seed company between $19 and $22 per bag.

McFarling signed the Technology Agreement and paid the required fees in 1998. (App. 4a). Monsanto later sued McFarling, alleging that he had breached the Technology Agreement and had infringed both patents by replanting "saved" seeds in the 1999 and 2000 growing seasons. (App. 4a). Monsanto obtained a preliminary injunction prohibiting McFarling from continuing to plant Roundup Ready soy-

beans, and the Federal Circuit upheld that order (*McFarling I*) (App. 57a-88a). McFarling complied with the injunction, limiting Monsanto's damages to those arising from McFarling's conduct in the 1999 and 2000 growing seasons.

Monsanto later obtained a grant of partial summary judgment, including a judgment that McFarling had infringed both patents and had violated the Technology Agreement. On appeal from that judgment, the Federal Circuit vacated a damages award of $780,000 that was based on a clause in the Technology Agreement imposing a liquidated penalty of 120 times the Technology Fee (*McFarling II*) (App. 105a-137a). In reaching that conclusion, the Federal Circuit rejected Monsanto's argument that enforcing the liquidated-damages clause was necessary to prevent McFarling from "gain[ing] a competitive advantage in the marketplace" relative to farmers who had complied with the Technology Agreement. (App. 136a). "This argument," wrote the court, "is inimical to the compensatory nature of contract remedies: it sounds in deterrence, not compensation, and therefore suggests that the multiplier is in the nature of a penalty clause rather than a liquidated damages clause." (App. 136a). The Federal Circuit then remanded to the district court "for a determination of actual damages." (App. 137a).

On remand, Monsanto withdrew all claims other than its '605 patent claim, including its contract claim, and thereby further limited the ensuing jury trial to a determination of patent-infringement damages. (App. 5a, 21a). Monsanto ultimately was awarded $375,000, or $40 per bag of planted seed—

more than *six times* the $6.50-per-bag Technology
Fee. (App. 5a-6a). The district court upheld the
award on the theory that McFarling might continue
to replant these seeds and thus cause Monsanto to
sustain future damages, even though it was undis-
puted that McFarling had done no replanting of
seeds since being enjoined from doing so in 2001.
(App. 19a-20a, 22a, 25a-28a, 30a n.2).

Throughout these proceedings, McFarling con-
tended that the patent laws did not allow Monsanto
to control the future use of seeds that were a natural
product of the seeds that he had bought and planted.
He initially lost these claims when the Technology
Agreement was in the case; but he renewed them
when Monsanto's claim for damages was based
solely on the '605 patent, which did not on the face of
the claims extend to replanted seeds. Despite these
changes, the district court adhered to its prior rul-
ings and denied McFarling's JMOL motion in which
he had re-asserted his patent-misuse defense.
(App. 8a-9a).

On appeal from that judgment, McFarling raised
the two issues discussed here: (1) damages and (2)
patent exhaustion and misuse.

2. As to damages, McFarling argued that the
award was grossly excessive and should have been
limited to the $6.50-per-bag Technology Fee, which
was the "established royalty" for purposes of 35
U.S.C. § 284. But the Federal Circuit disagreed and
affirmed the $40-per-bag award—although not on
the theory presented to the jury, approved by the

district court, or argued by Monsanto in the Federal Circuit. (App 1a-2a).

The Federal Circuit's decision explored two distinct methods for justifying the jury's damages award: an "established royalty," and a hypothetical royalty. Finding it impossible to justify the entire $40 figure using the "established royalty" method, and being unable or unwilling to rely on the district court's rationale for upholding the award, the Federal Circuit created its own hypothetical royalty based principally on the benefits that McFarling supposedly obtained from his infringing acts. The court's analysis of the established and hypothetical royalties proceeded as follows.

*[1] The Established Royalty.*

The established royalty that the Federal Circuit first investigated contained two components:

*[a] The Technology Fee ($6.50 per bag).* McFarling agreed that this component was legitimate as it constituted the "established royalty" set by the Technology Agreement. (App. 8a-9a).

*[b] The Seed Company Fee (additional $19 to $22 per bag).* McFarling argued that Monsanto had no standing or right to obtain this amount as damages, because any Seed Company Fees would have been paid to seed companies, not to Monsanto.

But the Federal Circuit held that the Technology Fee *plus* the Seed Company Fee (less certain minor costs) could be "characterized as a pure royalty payment" and thus as the established royalty in the case. (App. 11a).

The court's basic rationale was that the Seed Company Fee must be part of the established royalty because Monsanto's Technology Agreement required farmers to buy seeds from authorized seed companies that charged that fee. (App 10a-12a). By requiring farmers to patronize authorized seed companies, Monsanto effectively "direct[ed] part of the royalty to the third-party seed companies, which promoted and distributed Monsanto's products." (App. 11a). Thus, to hold that the established royalty was only $6.50 would "not acknowledge the significance of the requirement that licensees not only pay the $6.50, but also purchase the genetically modified seeds from a seed company rather than replanting saved seed." (App. 12a).

The court added that limiting the "established royalty" to $6.50 "would create a windfall for infringers like McFarling" who would obtain "a huge advantage over other farmers" who paid the Seed Company Fee and complied with other license terms. (App. 11a-12a). Thus, the court discerned a "deterrence" function for patent-infringement damages that it had rejected with respect to contract damages in *McFarling II*.

The Federal Circuit found that the "established royalty method" could justify a royalty of up to $28.50 per bag (the $6.50 Technology Fee plus a $22 Seed Company Fee)—*if* one took the unprecedented step of including in the royalty losses of gross revenues to third parties (the seed companies). But, even including losses to third parties—a theory never presented to the jury—the "established royalty" method could not justify the $40 per bag that

the jury had awarded. To uphold that award, another methodology would be required.

*[2] The Hypothetical Royalty.* The Federal Circuit held that it would be *"improper"* to limit damages to its already inflated "established royalty," because Roundup Ready soybean seeds offer farmers such valuable advantages over conventional soybean seeds that it would be rational to pay as much as $61 per bag for them. (App. 13a-14a) (emphasis added).

Based on the testimony of Monsanto's expert, the court concluded that the monetary benefits to farmers from using Roundup Ready seed instead of conventional seed included increased yields and cost savings worth $31 to $61 per acre. Since it takes about one bag to plant one acre, benefits per bag could be as high as $61. (App. 13a-14a). Accordingly, the benefits to the purchaser alone made it "reasonable for the jury to suppose that, in a hypothetical negotiation, a purchaser would pay a royalty of $40 per bag for the Roundup Ready seed." (App. 14a).[1]

3. On the issue of patent exhaustion and misuse, the Federal Circuit held that, by replanting seeds produced from ones that he had purchased, McFarling had made infringing copies of Monsanto's patented invention, even though those replanted seeds naturally grew from the soybean plants. (App. 7a) (emphasis added). ("Monsanto's 605 patent reads on

---

[1] The court also purported to take into account the benefits of the licensing program to Monsanto, but failed to quantify them. (App. 12a-13a).

both purchased and farmer-grown Roundup Ready soybeans"). Thus, the Federal Circuit reasoned, McFarling infringed the 605 patent merely by making the ordinary and expected use of soybean seeds that he had purchased from Monsanto—planting them in the ground to grow soybean plants whose seeds he then replanted.

## REASONS FOR GRANTING THE PETITION

### I. The Federal Circuit has rewritten the patent-damages statute to provide patent owners with a remedy that far exceeds the amount "adequate to compensate for the infringement."

The patent-damages statute, 35 U.S.C. § 284, provides in part that the court "shall" award a successful patent-infringement plaintiff "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

Under § 284, "[t]he goal of the law of monetary relief for patent infringement is to provide full compensation to the owner of a patent." 7 Donald S. Chisum, *Chisum on Patents* § 20.01, at 20-7 (2002) [hereinafter "*Chisum*"]. "The primary award should be the best approximation of the amount necessary to restore the owner to the financial position he would have enjoyed had the infringer not engaged in unauthorized acts in violation of the owner's exclusive patent rights." *Id.*

*McFarling III* completely rewrites this fundamental compensatory principle, and authorizes courts in future cases to award patent owners wind-

fall damages that they never would have received had the infringement not occurred. In the case at bar, these super-compensatory awards included:

\* **A hypothetical royalty that exceeded, by a factor of six, the established royalty that the patent owner demanded in the real world.** The underlying theory of this award was that—even when the market completely answers the question of what a "reasonable royalty" would have been—juries not only may, but *must,* award more than the "established royalty" if the record would support a finding that the benefits to the defendant of using the product exceeded the established royalty. To award merely the "established royalty" under those circumstances would be *"improper,"* according to these new teachings. This stands long-established patent-damages principles on their head. In the past, this Court (and the Federal Circuit itself) had long held that an established royalty is preferable to a hypothetical one when determining "reasonable royalty" damages.

\* **Alternatively, an "established royalty" that included (a) losses sustained not by the patent owner, but by *third parties* in the patent owner's distribution network, and (b) money awarded to deter the infringer from using the savings from his infringement to engage in unfair competition.** This unprecedented method of calculating an "established royalty" violates the basic standing principle that a litigant cannot obtain damages for someone else's losses.

*McFarling III* also suggests that a "reasonable royalty" should include enhancements to discourage

the infringer from competing unfairly with others who complied with their license obligations. But compensation, not deterrence, is the touchstone of patent damages under § 284.

Moreover, the *McFarling III* rule achieves deterrence by forcing the infringer to disgorge the savings that he achieved through infringement. But Congress eliminated equitable disgorgement as a patent-damages remedy in 1946. *McFarling III* thus rewrites § 284 in contravention of an explicit Congressional policy.

### A. *McFarling III* violates the rule that an established royalty generally precludes the use of a hypothetical one.

The *McFarling III* decision disrupts previously settled law and introduces confusion about whether and when an established royalty should preclude the factfinder from considering and awarding a "hypothetical" one.

1. Even after it had finished inflating the "established royalty" by including losses to third-party distributors, the Federal Circuit concluded that it would be "improper" to limit damages to that amount because Roundup Ready seeds generated additional benefits to the patent owner and the infringer that—for some unexplained reason—were not captured adequately in the established royalty. (App. 12a).

Accordingly, the court approved a hypothetically negotiated royalty that was more than *six times* the $6.50 per bag that Monsanto actually charged as a Technology Fee. In so doing, the Federal Circuit vio-

lated basic patent-damages precepts. As this Court held over 120 years ago, "[i]t is a general rule in patent causes that established license fees are the best measure of damages that can be used." *Clark v. Wooster*, 119 U.S. 322, 326 (1886). Modern cases reaffirm that, "[w]here an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty." *Nickson Indus., Inc. v. ROLM Mfg. Co.*, 847 F.3d 795, 798 (Fed. Cir. 1988); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983).

For a royalty to be deemed "established" under this Court's test in *Rude v. Wescott*, 130 U.S. 152 (1889), "it must be paid or secured before the infringement complained of; it must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention; and it must be uniform at the places where the licenses are issued." *Id.* at 185. Thus, "[i]t is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use, and sell his patents as to establish a regular price for a license, that price may be taken as a measure of damages against infringers." *Id.* In this case, there is no question that these standards were satisfied. *Every* soybean farmer who planted Monsanto's genetically modified soybeans—more than 90% of the soybean farmers in the country (App. 26a)—paid Monsanto the same $6.50-per-bag Technology Fee for those rights.[2]

---

[2] Monsanto's justification in the trial court for damages above $6.50 was that McFarling could continue to

2. The law also provides for a second-best solution if no established royalty can be proved. In that event, the factfinder can base the award "upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee." *Hanson*, 718 F.2d at 1078.

But the law is clear that a hypothetical royalty should *not* be awarded if an established royalty exists. *See, e.g, Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) ("*Lacking evidence of royalties in the marketplace*, this court accepts evidence about hypothetical results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began.") (emphasis added); *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1445 (Fed. Cir. 1990) (reasonable royalty "'may be based upon an established royalty, if there is one, or *if not*[, then] upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee.'") (emphasis added); *id.* at 1446 ("*Because no established royalty existed* for licensing the Trell patent, the district court 'necessarily had to use a "a willing buyer/willing-seller concept"'") (emphasis added); *Hughes Aircraft Co. v. U.S.*, 86 F.3d 1566, 1569 (Fed.

---

replant the naturally recurring seeds every year, and that seeds that could be replanted were worth more than $6.50. That theory cannot support this award because McFarling was enjoined from replanting seeds starting in 2001, and it is undisputed that he adhered fully to that injunction. The Federal Circuit did not rely on the risk of replanting as justification for an award higher than $6.50 per bag.

Cir. 1996) ("*Because an established royalty rate did not exist* for licensing the Williams patent, the court determined the royalty rate using the 'willing buyer/willing seller' rule.") (emphasis added); *see also Marvel Specialty Co. v. Bell Hosiery Mills, Inc.*, 386 F.2d 287, 292 (4th Cir. 1967) (holding that information relating to infringer's profit did not "have relevance to a reasonable royalty. There was in this case an established royalty, and inquiry should not have extended beyond it.").

The rule that an established royalty precludes a hypothetical one makes perfect sense, because McFarling knew that he could walk into any authorized seed store and walk out with a bag of Roundup Ready seed for as little as $25.50, of which $6.50 would go to Monsanto. There is no reason to "hypothesize" that he would have paid Monsanto a dime more.[3]

---

[3] Until *McFarling III*, the only circumstance in which courts had authorized a hypothetical royalty that exceeded an established one was "when the evidence clearly show[ed] that widespread infringement made the established royalty artificially low." *Nickson Indus.*, 847 F.3d at 798. To invoke this exception, there must be a "substantial factual basis which justifie[s] the court's decision to disregard the existing license rate." *Trio Process Corp. v. L. Goldstein's Sons, Inc.* 612 F.2d 1353, 1359 (3d Cir. 1980). But no "substantial factual basis" for such a deviation exists where the "license rate agreed upon between [the parties] was arrived at in free and open negotiations conducted prior to any infringing activity," there are no "allegations * * * of industry-wide infringement," and there is "no indication that the license rates * * * de-

3. *McFarling III* throws long-established princi-
ples of patent damages into confusion, and creates
substantial uncertainty for those accused of patent
infringement.[4] Before this case, patent damages
were anchored, whenever possible, in marketplace
realities. In keeping with the compensatory purpose
of § 284, courts accepted actual, market-based data
about the value of patents over expert-driven hy-
potheticals that can easily test the limits of a lay
jury's comprehension. That principle is now in tat-
ters. Patent owners unsatisfied with charging what
the market will bear can now obtain super-
competitive returns in patent-infringement suits.
The economic incentive to bring marginal or even
meritless infringement claims will be overwhelming.
And courts following *McFarling* will have no choice
but to accept circumstantial evidence about what
hypothetical parties might have negotiated in a

---

clined after [the] infringement." *Id.* at 1359. That is the
case here. Nothing in *McFarling III* suggests that Mon-
santo's standard licensing fees were artificially depressed
by widespread infringement.

[4] Nor is *McFarling III* the only recent Federal Circuit
decision to do so. In *Monsanto v. Ralph*, 382 F.3d 1374
(Fed. Cir. 2004), the Federal Circuit similarly affirmed a
damages award far in excess of the established royalty
because it concluded that the patentee in a hypothetical
negotiation wouldn't agree to the terms of that royalty.
To be sure, the facts of *Ralph* contained egregious behav-
ior by the defendant that did not occur here; but as we
note below, patent damages are not intended to deter in-
fringement—merely to compensate for it.

counterfactual world in preference to actual evidence of what real parties were in fact willing to pay.

Accordingly, this Court should grant review to settle the now-unsettled law regarding the relationship between established and hypothetical royalties in determining a "reasonable royalty" under 35 U.S.C. § 284.

### B. By awarding the patent owner damages incurred by third-party distributors, *McFarling III* violates standing principles and the rule against equitable disgorgement of infringer profits.

The Federal Circuit's alternative analysis, which purported to justify only part of the $40-per-bag damages award, presumed that the "established royalty" could include losses sustained not by the patent owner, but by third-party distributors—*i.e.*, the seed companies. This aspect of the *McFarling III* decision warrants review on two grounds.

**First**, it violates basic standing principles that preclude a party from obtaining damages for losses sustained by others.

**Second**, part of the Federal Circuit's justification for including third-party losses in the established royalty was to prevent McFarling from reaping a competitive advantage over other licensee farmers who paid the Seed Company Fee. In other words, the court made McFarling disgorge part of the savings that he achieved through infringement. But this rationale injects an improper "deterrence" rationale into § 284 and violates Congress's 1946 de-

cision to remove infringer profits from the patent-damages formula.

### 1. *McFarling III* violates the standing rule that a litigant cannot recover damages for others' losses.

The Seed Company Fee which equaled roughly half of the damages award in this case represented money that would have been paid to seed companies—not to Monsanto. Not only that—it represents *all* of the revenues that the seed companies would have obtained from selling Roundup Ready seed. The Federal Circuit's opinion therefore rests on the completely unexplained (and inexplicable) assumption that Monsanto's distributors turn over to Monsanto 100% of their revenues from sales of Roundup Ready seeds. In other words, the distributors are assumed for no apparent reason to work not merely for free, but indeed, at a loss, since they no longer could recoup the cost of processing and selling the seeds.[5] This assumption is doubly bizarre, since the facts of the case make it quite clear that the seed companies, far from turning over all the Seed Company Fee to Monsanto, in fact kept it all. When a farmer bought a bag of seed, Monsanto received only the $6.50 Technology Fee.

---

[5] *Cf. Marconi Wireless Tel. Co. of Am. v. United States,* 53 U.S.P.Q. 246 (Ct. Cl. 1942) ("[W]e can readily assume that the price agreed upon would be something less than it would have cost defendant to use an equivalent device, for, unless this were done, the defendant as a party to this negotiation would receive absolutely no benefits.").

*McFarling III* thus stands for the radical proposition that, in addition to awarding a patent owner an established, industry-wide royalty—here, the $6.50-per-bag Technology Fee—a jury should award the patent owner vast sums representing all of the revenues that the patent owner's authorized distributors would have obtained but for the infringement.

That is simply not a remedy that a litigant has standing to seek in federal court. It is, of course, fundamental that a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 164 (1972). "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). And "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.*; *cf. Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007) (due process forbids using a punitive-damages award "to punish a defendant for injury that it inflicts upon nonparties * * * , *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation").

Accordingly, although some exceptions to the general standing rule exist, courts have had no trouble reaching the "common conclusion" that "standing to assert the rights of others does not extend to col-

lecting damages measured by injury to others." 13 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3531.9, at 569-70 (2007).[6] Yet that is exactly what occurred here.

2. **Forcing McFarling to disgorge the benefits of his infringement—*i.e.*, his nonpayment of the Seed Company Fee—injects an improper "deterrence" rationale into § 284 and violates its rule against equitable disgorgement of infringer profits.**

The Federal Circuit tried to justify its departure from normal standing principles by explaining that, unless the Seed Company Fee were included in the established royalty, infringers like McFarling would gain a competitive advantage over noninfringing farmers who paid the Seed Company Fee. The court ruled that this "windfall" should be paid to Monsanto instead. (App. 11a-12a).

But this "deterrence" function is foreign to the law of § 284 damages, which are strictly intended to compensate the patent owner, not to level the playing field between the infringer and other licensees. As this Court made clear more than a century ago in *Coupe v. Royer*, 155 U.S. 565 (1895):

---

[6] *See also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 119 n.14 (1985) (airline could not "assert the right of others to recover damages against" union for discriminatory conduct); *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978) ("[P]laintiff offers no reason why he should be able to recover damages for a violation of the rights of other[s]").

> At law, the plaintiff is entitled to recover, as damages, compensation for the pecuniary loss he has suffered from the infringement, *without regard to the question whether the defendant has gained or lost by his unlawful acts*; the measure of recovery in such cases being, not what the defendant has gained, but what plaintiff has lost.

*Id.* at 582 (emphasis added). Ironically, in *McFarling II*, the Federal Circuit expressly rejected the same deterrence rationale in connection with Monsanto's claim for contract damages. In that decision, the Federal Circuit held that enhancing Monsanto's damages to level the playing field between McFarling and other licensees would be "inimical to the compensatory nature of contract remedies" because it "sounds in deterrence, not compensation." (App. 136a).[7] Yet in *McFarling III*, the Federal Circuit accepted the very same rationale in connection

---

[7] Although the Federal Circuit in *Monsanto II* was reacting to a clearly punitive liquidated-damages penalty of 120 times the Technology Fee, the distinction is one of degree, not kind. Including third-party damages in the established royalty here inflates the established $6.50-per-bag royalty more than four-fold—still a significant departure from the principle of pure compensation, and more than the trebling of damages used for deterrent purposes in antitrust law (*see* 15 U.S.C. § 15(a)) and under the patent-law willfulness doctrine (*see Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1569-72 (Fed. Cir. 1996)). And as noted above, the total award that the Federal Circuit affirmed was even more punitive—over *six* times the actual loss to Monsanto.

with Monsanto's argument that its § 284 damages should be enhanced by including the losses sustained by third-party seed companies. The inconsistency is evident, because § 284 damages, like contract damages, are compensatory in nature.

The Federal Circuit's unfair-competition rationale effectively seeks disgorgement of infringer profits—a remedy that Congress abolished in 1946. Prior to 1946, the precursor to § 284 provided that a successful patent-infringement plaintiff "shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby * * * ." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 505 (1964) (quoting R.S. § 4921, as amended, 42 Stat. 392). Thus, "[u]nder the pre-1946 statute, the owner of a patent could recover both his own damages and the infringer's profits." *GM Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983). But "[i]n 1946 Congress excluded consideration of the infringer's gain by eliminating the recovery of his profits, * * * the determination of which had often required protracted litigation." *Id.* "By the 1946 amendment, * * * the statute was changed to approximately its present form, whereby only [the patent owner's] 'damages' are recoverable. The purpose of the change was precisely to eliminate the recovery of [the infringer's] profits as such and allow recovery of damages only." *Aro*, 377 U.S. at 505 (footnote omitted).[8]

---

[8] The *Aro* Court explained that, in the pre-1946 patent nomenclature, "'what the infringer makes is "profits,"

Accordingly, "it is clear that under the present statute only damages are recoverable." *Id.* at 506. But, under its unfair-competition rationale, the Federal Circuit has authorized patent owners to recover the entire cost savings that an infringer obtained through infringement—including, in this case, savings from not paying a fee charged by authorized distributors.

*McFarling III* therefore takes the law of patent damages back to 1946, and directly contravenes both the statutory language and this Court's interpretation of that language in *Aro*. Here, too, the Federal Circuit has thrown a previously well-settled damages rule into disarray. Patent owners after *McFarling III* can be expected to seek compensation for unjust enrichment, arguing that, like McFarling, the defendants in their cases should not be entitled to a "windfall" from their infringement.

Accordingly, this Court should grant certiorari to restore patent damages to their proper role of compensating patent owners, not deterring infringers or disgorging profits.

## II. The Federal Circuit has improperly broadened patent rights by vitiating the doctrine of patent exhaustion.

It defies both common sense and the patent-exhaustion doctrine to hold, as the Federal Circuit did here, that a farmer who buys seeds from Monsanto in order to plant them, and actually does plant

what the owner of the patent loses by such infringement is "damages."'" 377 U.S. at 505.

them, infringes Monsanto's patent because the plants naturally produce new copies of the seeds as they grow. This Court's precedents have long held that one who purchases a good from the patent owner or from a licensee is free to make the ordinary and expected use of that good, at least unless restricted by a valid contract. This Court has applied that principle even where, as here, the defendant buys precursor materials and makes the patented invention from those materials. *McFarling III* completes the Federal Circuit's decades-long effort to circumscribe this Court's exhaustion precedent. Once the proper boundaries of the patent right are understood, it becomes evident that Monsanto has transgressed those boundaries and therefore must answer for its misuse of the patent.

McFarling put the invention he bought to its only reasonable use. He purchased seeds; he planted them in the ground; and they grew into soybean plants, which naturally produce new seeds. The Federal Circuit held that, merely by planting the seeds he purchased, McFarling has made infringing copies of its patented invention, since planting the seeds generated new seeds. (App. 6a-8a). But the new seeds cannot be infringing under this Court's long-established principle of patent exhaustion because they are—literally—the natural result of putting the purchased invention to its only reasonable use. As a result, the Federal Circuit erred in rejecting McFarling's patent-misuse claim on the basis that Monsanto was merely acting within the scope of its patent rights. It was not.

1. In *Adams v. Burke*, 84 U.S. 453 (1873), this Court stated, "in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use." *Id.* at 456. The last time it examined the patent-exhaustion doctrine, this Court strengthened *Adams'* holding, stating that, once a patentee has received his reward through "the sale of the article," then "patent law affords no basis for restraining the use and enjoyment of the thing sold." *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942).

*Univis Lens* is a particularly apt analogy because there—like here—the patentee did not actually sell the defendant the patented invention, but rather a precursor: eyeglass lens blanks that the defendant converted into patented lenses for sale. Even though the defendant in *Univis Lens* "made" and "sold" the infringing product itself, this Court held that the exhaustion doctrine precluded liability as a matter of patent law because the ordinary and expected use of the lens blanks was to grind them into the patented lenses:

> the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold. * * * The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers. Whether the licensee sells that pat-

ented article in its completed form or
sells it before completion for the pur-
pose of enabling the buyer to finish and
sell it, he has equally parted with the
article, and made it the vehicle for
transferring to the buyer ownership of
the invention with respect to that arti-
cle.

*Id.* at 249, 251-52. Similarly, the sale of patented
soybean seeds to farmers was useful only in planting
those seeds, and therefore in growing soybean plants
that would by their nature generate new seeds. The
idea that Monsanto can sell seeds to farmers, and
then charge each of them with infringement for mak-
ing the only foreseeable use of those seeds—planting
them—strikes at the heart of the exhaustion doc-
trine.

It is true that the soybean plants here naturally
make not just one but many seeds, and that Mon-
santo may have a business interest in restricting by
contract the uses to which farmers put those seeds.
But there is no such enforceable contract at issue in
this case. In earlier proceedings before the district
court, Monsanto contended that McFarling was li-
able for breach of contract as well as for patent in-
fringement. (App. 20a-21a). McFarling challenged
the validity of the contract, and persuaded the Fed-
eral Circuit that its liquidated damages provision
was an unlawful penalty. (App. 120a-137a). Rather
than prove enforceability of the contract and breach
by McFarling and then seek ordinary contract dam-
ages, Monsanto made a strategic decision to abandon
its contract claim. (App. 21a). Monsanto had its op-

portunity to assert that a contract bound McFarling. It forewent that opportunity. Accordingly, Monsanto was left to assert its naked claim that it may control all post-sale use of its patented invention as a matter of patent law, and it is that radical proposition that the Federal Circuit adopted.

The Federal Circuit's decision highlights the extent to which that court has departed from the principles of patent exhaustion. It is one thing to hold, as the Federal Circuit has done, that patentees may impose some post-sale restrictions by contract. *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 706 (Fed. Cir. 1992).[9] It is quite another for the Federal Circuit to hold that Monsanto had the power *as a matter of patent law* to place post-sale restrictions on McFarling's use of the seeds he purchased. As this Court put it in *Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 662-66 (1895):

> [W]e think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in

---

[9] What contractual restrictions may be permissible as a matter of law is not a question this Court need reach, given Monsanto's abandonment of its contract claim. *Cf. Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 517 (1917) ("it is not competent for the owner of a patent by notice attached to its machine * * * to send its machines forth into the channels of trade of the country subject to conditions as to use or royalty to be paid to be imposed thereafter at the discretion of the patent owner.").

such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws.

2. The Federal Circuit has in this case sub silentio rejected the holdings of both *Univis Lens* and *Keeler*, something it has no power to do.

Nor is that sub silentio rejection limited to this case. The Federal Circuit's gradual erosion of this Court's exhaustion precedent, leading up to its outright rejection in this case, has not gone unnoticed. Commentators have been virtually unanimous in their scorn for the Federal Circuit's abandonment of this Court's guidance on the scope of the exhaustion doctrine.[10]

---

[10] *See, e.g.,* James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts About the CAFC's Mallinckrodt Decision,* 75 J. Pat. & Trademark Off. Soc'y 550, 554 (1993); Arthur J. Gajarsa et al., *How Much Fuel to Add to the Fire of Genius? Some Questions About the Repair/Reconstruction Distinction in Patent Law,* 48 Am. U. L. Rev. 1205, 1229-30 (1999); Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine in U.S. Patent Law: Mallinckrodt v. Medipart,* 15 Eur. Intell. Prop. Rev. 460, 461 (1993); Thomas Arno, *Use Restrictions and the Retention of Property Interests in Chattels Through*

Indeed, scholars have focused attention on Monsanto's restriction on post-sale reuse of its patented seeds as a particularly pernicious consequence of this abandonment. Commentators agree that while a seed-selling patentee may restrict use of its invention by contract in certain circumstances, the self-replicating nature of the invention itself means that the exhaustion doctrine gives the buyer an implied license to grow more seeds by planting the purchased seeds in the ground.[11] These commentators recognize that applying the traditional contours of the exhaustion doctrine to biotechnology does not "eviscerate the rights of the patent holder," as the Federal Circuit asserted in *Monsanto Corporation v. Scruggs*, 459 F.3d 1328, 1336 (Fed. Cir. 2006). A patentee may enter into contracts imposing certain restrictions on the purchaser's use of the invention, as Monsanto previously claimed McFarling had done in the instant case. *See* Carstensen, *supra*, at 1058. He may decline to sell the seeds altogether, instead making a bailment. *See* Chambers, *supra*, at 329. Or he may use further technological means, such as Genetic Use Restriction Technologies, that make re-use impossible. *See* Keith Aoki, *Weeds, Seeds & Deeds: Recent Skirmishes in the Seed Wars*, 11 CARDOZO J. INT'L & COMP. L. 247, 255-57 (2003). But

---

*Intellectual Property Rights*, 31 San Diego L. Rev. 279 (1994).

[11] *See, e.g.*, Peter Carstensen, *Post-Sale Restraints via Patent Licensing: A "Seedcentric" Perspective*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1053 (2006); Scott A. Chambers, *Exhaustion Doctrine in Biotechnology*, 35 IDEA 289 (1995).

he may not rely on the patent law to impose these restrictions for him.

3. Because the Federal Circuit has established (in an earlier decision between these parties) a *per se* rule that "[i]n cases in which the restriction is reasonably within the patent grant, the patent misuse defense can never succeed," *Monsanto v. McFarling*, 363 F.3d 1336, 1341 (Fed. Cir. 2004) (*McFarling II*), its decision to ignore the exhaustion principle led directly to its rejection of McFarling's misuse defense. Once the exhaustion doctrine is properly understood, McFarling is entitled to prove his patent-misuse claim on the merits without being subject to this *per se* rule.

4. On April 16, 2007, this Court invited the Solicitor General to file a brief *amicus curiae* in *Quanta Computer, Inc. v. LG Electronics, Inc.*, No. 06-937, expressing the views of the United States regarding whether certiorari should be granted on the issue of patent exhaustion. If the Court grants certiorari in *Quanta Computer*, it should do so here as well. Both cases raise the issue of whether a patentee may place post-sale conditions on the use of its patented invention. Here, as in *Quanta Computer*, no enforceable license binds the accused infringer. Here, as in *Quanta Computer*, the patented invention was put to its only reasonable use. And here, as in *Quanta Computer*, the Federal Circuit's recent erosion of the exhaustion doctrine has led to a startling expansion in the patent holder's right to control the use of his invention after its first sale.

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

MARK A. LEMLEY
*Counsel of Record*
STEVEN A. HIRSCH
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 676-2286

| | |
|---|---|
| ALAN B. MORRISON | JIM WAIDE |
| 1937 Biltmore Street NW | WAIDE & ASSOCIATES |
| Washington, DC 20009 | 332 N. Spring Street |
| (202) 506-6744 | Tupelo, MS 38802-1357 |
| | (662) 842-7324 |

*Counsel for Petitioner Homan McFarling*

August 21, 2007